UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CAZIONN WILLIAMS,

          Plaintiff,

v.                                        Case No. 23-CV-711

WILLIAM SWIEKATOWSKI, *et al.*,

          Defendants.

## DECISION AND ORDER

Plaintiff Cazionn Williams, who is incarcerated and representing himself, brings this lawsuit under 42 U.S.C. § 1983. Williams was allowed to proceed on a claim against William Swiekatowski, Tiffany Runciman, Hillary Berg, and Amy Woolf pursuant to the Eighth Amendment for allegedly ignoring the fact that he swallowed razor blades. The defendants filed a motion for summary judgment, which is fully briefed and ready for a decision. (ECF No. 68) The parties have consented to the jurisdiction of a magistrate judge. (ECF Nos. 4, 20.)

### PRELIMINARY MATTER

The defendants argue that Williams failed to follow Federal Rule Civil Procedure 56 and Civil Local Rule 56 when responding to their motion for summary judgment. Thus, they contend, their facts should be deemed uncontested and undisputed. (ECF No. 83 at 1.)

District courts are entitled to construe *pro se* submissions leniently and may overlook a plaintiff's noncompliance by construing the limited evidence in the light most favorable to the plaintiff. *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016). While Williams's combined proposed findings of fact and response to the defendants proposed findings of fact do not formally conform with the rules, his response contains sufficient facts to allow the court to rule on the defendants' summary judgment motion. Additionally, Williams filed a declaration in which he stated pursuant to 28 U.S.C. § 1746 that his facts were true and correct. As such, the court will consider the information contained in Williams's submissions where appropriate in deciding defendants' motion.

## FACTS

At all relevant times Williams was incarcerated at Green Bay Correctional Institution (GBCI). (ECF No. 70, ¶ 1.) On April 27, 2022, defendant Runciman was working second shift as a Sergeant at GBCI, stationed in the Restricted Housing Unit (RHU). (*Id.*, ¶ 7.) At approximately 3:00 p.m., Runciman was conducting cell checks and stopping to speak with the prisoners in their cells. (*Id.*, ¶ 8.) Williams states he called her to his cell, told her he was suicidal, showed her a razor blade, and told her he was going to swallow it. (ECF No. 82, ¶ 4.) Runciman responded, "please don't," after which Williams placed the razor on his tongue and swallowed it. (*Id.*, ¶ 5.)

The defendants note that Williams did not swallow an entire razor blade but a small piece of razor blade. (ECF No. 70, ¶ 8.) They also assert that Runciman asked Williams to stop and hand the piece of razor blade to her, but because "of Williams's

safety restrictions, she was not able to open his cell door and retrieve it from him." (*Id.*, ¶ 9.) The defendants suggest that Williams smuggled the pieces of razor blade into the RHU when he was transferred there but note it is unclear where Williams obtained the pieces of razor blade. (*Id.*, ¶ 10.) Williams states he got the razor blades from staff because he was strip-searched prior to entering the RHU, so he couldn't have smuggled them in. (ECF No. 84, ¶ 10.)

The defendants assert that, upon watching Williams swallow the razor blade, Runciman immediately contacted the Health Services Unit (HSU), notifying the HSU that she was transferring Williams to the HSU. (ECF No. 70, ¶ 11.) However, she could not remove Williams from his cell because he was on "an active officer safety restriction that required three correctional officers to transfer him from one place to another." (*Id.*, ¶ 12.) She immediately requested two additional officers to assist her in the escort, but because of the staffing situation in the RHU there were not two other officers immediately available. (*Id.*, ¶ 13.) She needed to wait for two other officers to arrive from other locations throughout GBCI to transfer Williams to HSU. (*Id.*) Defendant Swiekatowski was one of the officers who responded to the request to assist with the escort. (*Id.*, ¶ 14.) According to the defendants, at 3:30 p.m., approximately a half hour after Williams swallowed the piece of the razor, he was transferred to the HSU. (*Id.*, ¶ 15.) Williams states that he was escorted to the HSU "almost 1 hour after swallowing the razors." (ECF No. 84, ¶ 15.)

Non-defendant Nurse Rachel Matushak examined Williams once he arrived in the HSU. (ECF No. 70, ¶ 16.) The defendants assert that the only thing Williams told

3

Matushak during the examination was that he swallowed a razor blade, and he would provide no additional information or communicate with Matushak. (*Id.*, ¶ 17.) Matushak noted that Williams had no difficulty walking and that his vitals were within a normal range. (*Id.*, ¶ 17.) She also observed that "Williams was not in acute distress. Bowel movement sounds were observed in all four quadrants of the abdomen, and the abdomen was flat and soft when palpated." (*Id.*, ¶ 18.) According to Matushak, Williams did not report any pain, vomiting, or blood in his stool. (*Id.*) She recommended a course of "watchful waiting," which "involves healthcare providers monitoring a patient's condition without immediate intervention. It can involve regular checkups, tests, and observations to detect any changes or progression of the patient's health." (*Id.*, ¶ 19.) The practice of HSU staff was to allow a foreign object to pass naturally unless "an inmate showed clear signs of medical distress, like abdominal pain or vomiting blood." (*Id.*, ¶ 20.)

Matushak also spoke with non-defendant Dr. Virginia Trzebiatowski via telephone to discuss her observations and recommendation. (ECF No. 70, ¶ 21.) Dr. Trzebiatowski recommended that Williams be seen in a follow-up appointment the next day, April 28, 2022. (*Id.*, ¶ 22.) Matushak advised Williams to contact HSU if he experienced "any vomiting or stooling of blood." (*Id.*, ¶ 23.) She also contacted the Psychological Services Unit (PSU), informing defendant Berg that Williams reported to Runciman that he was suicidal. (*Id.*, ¶ 24.) She then medically cleared Williams to return to his cell. (*Id.*, ¶ 25.)

Although he did not name her as a defendant, Williams states that Matushak did not provide him proper medical treatment. (ECF No. 84, ¶ 16.) He also asserts he told Matushak that he "swallowed numerous razors" and was in pain and coughing up blood. (*Id.*, ¶ 17.)

Runciman and Swiekatowski then escorted Williams back to his cell. As supported by Runciman's body camera video, Williams stated he thought he should be taken to the hospital and was unhappy that Matushak told him to drink MiraLAX. (ECF No. 77-4 at 00:20-00:48; ECF No. 70, ¶ 27.) According to the video, Williams was also walking fine and did not seem to be in pain. (*Id.*)

Once back at his cell, the defendants assert (and the video corroborates) that Williams told staff that he will swallow more razor blades. (ECF No. 77-4 at 00:48-1:00; ECF No. 70, ¶ 29.) Williams states, "Staff witnessed my [sic] swallow numerous razor blades they are trying to cover it up." (ECF No. 84, ¶ 29.)

The defendants assert that Berg and Woolf, who were Psychological Services Unit (PSU) staff, reported to Williams's cell "shortly after he returned from HSU." (ECF No. 70, ¶ 30.) Williams states that Berg first came to his cell an hour after he returned from HSU and asked him if he was suicidal. (ECF No. 82, ¶ 11.) Williams responded that he was and that is why he swallowed the razors. (*Id.*) Forty-five minutes later Woolf came to his cell and asked if he wanted to be seen by PSU, and Williams said yes. (*Id.*, ¶ 12.) He states Berg and Wolf never came to his cell together. (*Id.*, ¶ 13.)

The defendants assert that "Berg decided to immediately place Williams into Clinical Observation Status for his own safety" but "Williams was not notified of this

decision at that time." (ECF No. 70, ¶ 31.) Williams states that he was not immediately placed on Observation Status. (ECF No. 84, ¶ 31.) In preparation for transferring Williams to Observation Status, he was moved to a hearing room where he could be strip-searched and evaluated by Berg and Woolf. (ECF No. 70, ¶ 33.) The defendants assert that Williams stated he swallowed the razor blades because he said he was going to swallow them. (*Id.*, ¶ 34.) According to Berg's report, Williams did not appear unwell or complain of pain or appear to be in medical distress. (*Id.*)

At the end of the meeting, Berg told Williams he was being placed in Observation Status, and Williams "became agitated." (ECF No. 70, ¶ 35.) He "produced a small piece of razorblade, about one-quarter to one-half inch long and very thin, and immediately put it in his mouth." (*Id.*, ¶ 36.) At that point, Berg and Woolf left the room so security staff, including Swiekatowski, could intervene. (*Id.*) Williams refused to come out of the hearing room. (*Id.*) Staff gave Williams "time to calm down," and Swiekatowski observed that "Williams spat out what appeared to be some watered-down blood on the floor . . . .The blood was light in color." (*Id.*, ¶ 38.)

Swiekatowski states that he did not consider Williams to be coughing up blood and that Williams did not show any other signs of medical distress. (ECF No. 70, ¶ 38.) Williams states that non-defendant C.O. Green, Nurse Matushak, Berg, Woolf, and Swiekatowski saw him cough up blood. (ECF No. 84, ¶ 37.) Williams states that Swiekatowski noted in his incident report that Williams was coughing up blood. (*Id.*, ¶ 39.) The incident report states, "He had spit some very watered down blood on the floor of the strip cell during his wait to be placed on obs." (ECF No. 77-2 at 2.)

6

It is undisputed that Swiekatowski contacted HSU at 6:00 p.m. (ECF No. 70, ¶ 38.) He spoke to non-defendant Nurse Lydia Luebke and described the situation and Williams's condition. (*Id.*) Luebke "advised to call again if Williams had any further issues." (*Id.*, ¶ 38.) Swiekatowski returned to Williams in the hearing room, where they had a long conversation, and the body camera footage shows that Williams was not complaining of pain, coughing up blood, or communicating any other symptoms caused by swallowing the razors. (ECF No. 77-5; ECF No. 70, ¶ 39.) Williams was calm, spoke about how the situation was handled, and talked about how he wanted to transfer out of GBCI and no longer be in segregation. (*Id.*) Williams eventually gave consent to be searched, which was required to be placed in on Observation Status. (ECF No. 70, ¶ 39.) He was then searched and placed into Observation Status without incident. (*Id.*)

Nurse Luebke called and spoke to Swiekatowski at approximately 8:45 p.m., and Swiekatowski reported that Williams showed no signs of pain or medical distress. (ECF No. 70, ¶ 40.) Luebke "decided that no further follow-up was needed at this time." (*Id.*) Williams states he was in pain and coughing up blood the entire time. (ECF No. 84, ¶¶ 39-40.)

It is undisputed that the following day, April 28, 2022, Williams wrote a health services request slip while in Observation Status asking to be seen because he had swallowed razor blades and coughed up blood. (ECF No. 70, ¶ 42; ECF No. 84, ¶ 42.) Matushak examined Williams at 2:30 p.m. that day. (ECF No. 70, ¶ 43.) At that examination Williams complained of blocked ears and decreased hearing and had his ears cleaned. (*Id.*) According to defendants, he did not mention any stomach pain or

concerns related to swallowing the razors. (*Id.*) Williams simply states that he did not receive proper medical treatment that day but does not deny that he was treated for issues with his ears. (ECF No. 82, ¶ 20; ECF No. 84, ¶ 43.)

Also on April 28, 2022, Williams was seen by non-defendant staff psychologist Dr. Breen-Smith. (ECF No. 70, ¶ 44.) Williams states that he told Dr. Breen-Smith he was in pain and coughing up large amounts of blood but she did nothing. (ECF No. 84, ¶ 44.) The defendants state that Dr. Breen-Smith noted that Williams "showed no signs of distress during the appointment." (ECF No. 70, ¶ 44.) Williams was seen again by PSU staff on the following day, April 29, 2022, and "did not appear to be in any medical distress." (*Id.*, ¶ 47.)

On April 30, 2022, HSU received another health service request from Williams, stating that he had previously told HSU he was coughing up blood and HSU refused to see him. (ECF No. 70, ¶ 48.) Non-defendant Nurse Cotton responded by reminding Williams he was seen on April 28, 2022, and did not report any symptoms related to swallowing razor blades. (*Id.*) She scheduled Williams to be seen for throat pain. (*Id.*)

On May 2, 2022, HSU received another health service request from Williams, this time about throat pain. (ECF No. 70, ¶ 49.) Matushak examined him later that day, and Williams "stated his throat was not hurting during the appointment, but, when he swallowed, he would rate his pain as a seven on a scale of one to ten." (*Id.*, ¶ 49.) Matushak examined Williams's throat, noting "slight redness but no cuts or open areas." (*Id.*, ¶ 50.) He was prescribed ibuprofen and saltwater gargles for pain relief. (*Id.*, ¶ 50.)

Williams states that at this appointment he told Matushak that he was coughing up blood and that there was blood in his stools. (ECF No. 84, ¶ 50.)

After this appointment Williams was not seen again in either the HSU or the PSU for this incident. (ECF No. 70, ¶ 51.) It is undisputed that the pieces of razor passed naturally through Williams's system, though Williams notes that "they caused me pain when they passed and cut open my rectum which caused me to bleed and even more pain." (ECF No. 84, ¶ 51.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive

9

summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Williams claims that the defendants violated his Eighth Amendment rights when they did not provide him proper medical care after he swallowed razor blades.

A plaintiff must demonstrate four elements to establish deliberate indifference under the Eighth Amendment. *Hunter v. Mueske*, 73 F.4th 561, 565 (7th Cir. 2023). First, "there must be a risk of harm to the plaintiff that is so objectively serious as to be 'excessive' (and that risk must in fact materialize)." *Id.* Second, "the defendant must 'know' of the risk (put differently, he must possess subjective awareness that the risk exists)." *Id.* Third, "the defendant's response to the risk must be so inadequate as to constitute 'disregard' of (or deliberate indifference toward) the risk." *Id.* Finally, "the plaintiff must prove that the defendant's deliberate indifference actually *caused* his injury." *Id.* (citing *Roe v. Elyea*, 631 F.3d 843, 864 (7th Cir. 2011)).

The parties dispute whether swallowing foreign objects is an objectively serious medical condition, but the dispute is immaterial because no reasonable factfinder could conclude that any of the defendants acted with deliberate indifference toward Williams. Williams appears to be arguing that Matushak and Luebke were deliberately indifferent

10

because they did not provide him proper medical care. But neither of the nurses are defendants, so the court will not analyze whether their actions constitute deliberate indifference.

As for Runciman, her response to Williams's medical need was not inadequate. She immediately contacted the HSU upon learning that Williams had allegedly swallowed a razor. While it is undisputed that there was a short delay in transporting Williams to the HSU, whether the delay was a half hour or a full hour is disputed. "A delay in treatment may show deliberate indifference if it exacerbated the inmate's injury or unnecessarily prolonged his pain." *Perez v. Fenoglio*, 792 F.3d 768, 777-778 (7th Cir. 2015.) "Of course, delays are common in the prison setting with limited resources, and whether the length of delay is tolerable depends upon the seriousness of the condition and the ease of providing treatment." *Petties v. Carter,* 836, F.3d 722, 730 (7th Cir. 2016).

Taking the facts in a light most favorable to Williams, an hour delay to ensure the safety and security of both Williams and the staff was not unreasonable. Moreover, Williams does not present any evidence demonstrating that the delay unnecessarily prolonged his pain or exacerbated his condition. Summary judgment will be granted in favor of Runciman.

The same is true regarding Berg's and Woolf's delay in conducting a psychological evaluation. Williams presents no evidence that the roughly two-hour delay unnecessarily prolonged his pain or exacerbated his condition.

Turning to when Williams swallowed another razor in front of Berg, Woolf, and Swiekatowski, no reasonable factfinder could conclude that these defendants acted with

11

deliberate indifference. Williams became agitated and worked up when he learned that he was being transferred to observation status, which caused him to swallow another razor. Berg and Woolf, who are PSU staff and not security staff, acted reasonably in leaving the room so that Swiekatowski and the other security staff could do their job. "Public officials do not have a free-floating obligation to put things to rights, disregarding rules . . .along the way." *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). Handling a security situation was not part of Berg's and Woolf's job duties, and it was unclear at the time whether Williams needed medical care. Thus, they cannot be liable for failing to secure medical care for Williams after Williams swallowed another razor. Summary judgment will be granted in favor of Berg and Woolf.

Regarding Swiekatowski, no reasonable factfinder could find that he treated Williams with deliberate indifference. Once Williams was stabilized, Swiekatowski consulted with Nurse Luebeck, who told him to call her if the situation worsened. His responsibility was to seek medical care, and it is undisputed he did. Non-medical professionals like security officers are "entitled to rely on the medical professionals' determination[s]" concerning a prisoner's health care and recommended treatment. *McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013). "The only exception to this rule is that nonmedical officers may be found deliberately indifferent if they have reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (internal quotations omitted).

12

Swiekatowski spent several minutes with Williams talking through his situation after he swallowed another razor. The video does not show Williams to be in pain; he was coherent and able to air his grievances. Nothing suggested that Williams was in medical distress or that HSU was not providing proper medical care. Even if Williams was in medical distress, Swiekatowski again consulted with Luebeck after his conversation with Williams, who decided no follow-up care was needed.

Because Swiekatowski followed through on seeking medical care for Williams, no reasonable factfinder could conclude he was deliberately indifferent. Summary judgment will be granted in Swiekatowski's favor.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted. The defendants also argued that they were entitled to qualified immunity, but because the court found in their favor on the merits, it does not need to address the qualified immunity argument. Because there are no remaining claims, the case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (ECF No. 68) is **GRANTED.**

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

13

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 1st day of July, 2025.

BY THE COURT

*William E. Duffin*

WILLIAM E. DUFFIN
United States Magistrate Judge